IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

WILLIAM A. WHITE,
Petitioner,

v.

D. SPROUL,
Respondent.

Case No. 18–CV–01347–JPG

## MEMORANDUM & ORDER

Before the Court is Petitioner William A. White's Petition for Writ of Habeas Corpus. (ECF No. 1). He challenges the revocation of good-time credit after he tried publishing his "White Nationalist Counter-Intelligence Manual." The Court conducted a threshold review, (ECF No. 3); Respondent D. Sproul (warden) responded, (ECF No. 12); and White replied, (ECF No. 14). For the reasons below, the Court **DENIES** White's Petition.

**I.      PROCEDURAL & FACTUAL HISTORY**

White is an inmate incarcerated at the U.S. Penitentiary ("USP") in Marion, Illinois, within this District. (Petition at 1). In 2017, he authored the White Nationalist Counter-Intelligence Manual. (Petition at 2). Because of "groups like the Southern Poverty Law Center, a clique of Judaic homosexuals who make their living bringing marginal lawsuits against defenseless white dopes," White thinks that white nationalists need to come up with creative ways to protect their identities when conducting business on "Judaic-owned" platforms, such as PayPal, Amazon, eBay, and Facebook. (Petition, Ex. A at 4). To that end, the White Nationalist Counter-Intelligence Manual outlines the basics of corporate formation and the protections offered by the limited liability company. (*Id.* at 7). It also describes how to use international business companies to hold money in foreign countries without revealing your identity on any of the paperwork. (*Id.*). White,

of course, cautions against using these tactics "for an illegal purpose," as "breaking the law leads to your money being confiscated, and, that defeats the object of your exercise." (*Id.*). Even so, the White Nationalist Counter-Intelligence Manual suggests using cyphers and keys to encrypt messages when "you want to speak privately to another person who shares your concerns about not having every word that they say analysed [sic] by an adversarial power who is enslaving, and, exploiting them . . . ." (*Id.* at 14).

Authorities at USP Marion intercepted the White Nationalist Counter-Intelligence Manual when White tried emailing it to publishers. (Petition, Ex. B at 1). In the prison's view, the White Nationalist Counter-Intelligence Manual "endangers public safety, incites violence, instructs how to use codes, and how to commit other illegal activities." (*Id.*). The authorities then issued an incident report and referred the matter to a discipline hearing officer ("DHO"). (*Id.*).

The DHO conducted a hearing to determine whether White violated prison regulations 196, 296A, or 334; and, if so, what the appropriate punishment should be. (Petition, Ex. C at 1). White asserted that "the manual does instruct persons on encryption," and it is not a violation to simply describe "how codes work, without actually using them, or, creating a plan to use them . . . ." (*Id.* at 2). The DHO disagreed: "[B]y instructing the reader on how to use code and giving examples," White violated Code 296A, which prohibits inmates from using "the email for abuses other than illegal activity which circumvent email monitoring procedures . . . ." (*Id.* at 9). The DHO then revoked 15 days of White's good-time credit. (*Id.*).

White raised four arguments in his administrative appeal:

    (1)    There was no evidence that I attempted to circumvent email monitoring with a code;

    (2)    The policy, disciplinary code 296A, is void for vagueness;

      (3)      The same policy is un-constitutional facially, and, as applied; [and]

      (4)      The policy was applied in retaliation for the protected act of attempting to publish a manuscript.

(Petition, Ex. D at 1). The regional director disagreed: "The DHO sufficiently explained the greater weight of the evidence supports the charge." (Petition, Ex. E at 1). He raised the same issues on appeal to BOP's central office, (Petition, Ex. F at 1), who never responded, (Petition at 3).

In 2018, White petitioned this Court for a writ of habeas corpus under 28 U.S.C. § 2241. (*Id.* at 1). The Petition raised two arguments:

      (1)      "There was no evidence that [White] violated . . . Code 296A"; and

      (2)      "The BOP's extension of . . . Code 296A to these facts violates [the First Amendment]."

(*Id.* at 3, 6).

## II.    LAW & ANALYSIS

Section 2241 of Title 28 of the U.S. Code provides a mechanism by which inmates can attack the execution of a federal sentence by prison officials. It authorizes district courts to issue a writ of habeas corpus when a prisoner establishes that he is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2241.

Although prisoners may experience some diminished rights because of "the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for a crime." *Wolff v. McDonnell*, 418 U.S. 539, 555 (1974). This includes protections under the Due Process Clause of the Fourteenth Amendment, which prevents deprivations "of life, liberty, or property without due process of law." *Id.* at 555; U.S. Const. amend. XIV.

While "[i]t is true that the Constitutional itself does not guarantee good-time credit for satisfactory behavior while in prison," states may still provide "a *statutory* right to good time," thus implicating the right to due process. *Wolff*, 418 U.S. at 555 (emphasis added).

> [T]he State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.

*Id.*

Even so, "[t]he requirements of due process are flexible and depend on a balancing of the interests affected by the relevant government action." *Superintendent v. Hill*, 472 U.S. 445, 454 (1985). In the context of good-time credits, "the requirements of due process are satisfied if **some evidence** supports the decision by the prison disciplinary board to revoke" them. *Id.* (emphasis added).

> Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is **any evidence** in the record that could support the conclusion reached by the disciplinary board.

*Id.* (emphasis added) (internal citations and quotation marks omitted). "[E]ven a meager amount" of evidence is enough to satisfy the fundamental fairness guaranteed by the Due Process Clause. *Smith v. Roal*, 494 Fed. App'x 663, 664 (7th Cir. 2012); *Hill*, 472 U.S. at 457.

White challenges the DHO's conclusion that he violated Code 296A, which prohibits the following:

> **Use of the mail for abuses other than criminal activity which circumvent mail monitoring procedures** (e.g., use of the mail to commit or further a High category prohibited act, special mail abuse; *writing letters in code; directing others to send, sending, or receiving a letter or mail through unauthorized means*; sending mail for other inmates without authorization; sending correspondence to a specific address with directions or intent to have the correspondence sent to an unauthorized person; and using a fictitious return address in an attempt to send or receive unauthorized correspondence).

28 U.S.C. § 541.3, Table 1 at 296 (emphasis added).

### A. "Some Evidence" Supports the DHO's Decision.

White cites the case *Montgomery v. American Airlines, Inc.*, 625 F.3d 382 (7th Cir. 2016), to support his claim that "conclusory statements in a DHO report, without some reference to the evidence, are not 'some evidence.'" (White's Reply at 4). But that case had nothing to do with a prison disciplinary hearing, revoked good-time credit, or the "some evidence standard." Rather, it involved racial-harassment claims brought by an American Airlines employee. *See Montgomery*, 625 F.3d at 389–90. The Seventh Circuit used the phrase "some evidence" once when noting that the plaintiff failed to offer "some evidence allowing a reasonable inference that supervisors at American knew of the alleged racial harassment." *Id.* 392. In brief, *Montgomery* is irrelevant.

To the contrary, White's White Nationalist Counter-Intelligence Manual, as described in the DHO report, is itself "some evidence" that he violated Code 296A. True, White did not **explicitly** direct anyone to use code and circumvent prison monitoring procedures. But that, of course, was White's intention—to teach others how to subvert authorities in many ways, including through cyphers and keys. "The 'some evidence' standard is less exacting that the preponderance of the evidence standard, requiring only that the decision not be arbitrary and without support in the record." *McPherson v. McBride*, 188 F.3d 784, 786 (7th Cir. 1999). And some evidence

supports the DHO's conclusion that White used the mail[1] to give others the tools to circumvent the prison's monitoring procedures, a violation of Code 296A.

### B. Code 296A Does Not Violate the First Amendment.

The First Amendment of the Constitution prohibits the Government from "abridging the freedom of speech . . . ." And "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). But that rule is not ironclad: The rights secured by the Constitution "must be exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration." *Thornburgh v. Abbot*, 490 U.S. 401, 407 (1989) (quoting *Turner*, 482 U.S. at 85). So even if "[t]here is little doubt" that the prison censorship "would raise grave First Amendment concerns outside the prison context," there remains a "delicate balance that prison administrators must strike between the order and security of the internal prison environment and the legitimate demands of those on the 'outside' who seek to enter that environment, in person or through the written word." *Id.*

> Whatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech. And this does not depend on whether the nonprisoner correspondent is the author or intended recipient of a particular letter, for the addressee as well as the sender of direct personal correspondence derives from the First and Fourteenth Amendments a protection against unjustified governmental interference with the intended communication.

*Procunier v. Martinez*, 416 U.S. 396, 408–409 (1974).

---

[1] The Court rejects White's argument that "the TRULINCS system" is not "mail" under Code 296A. (White's Reply at 6). This Court has noted before that "TRULINCS is a computer system that allows federal inmates to send and receive electronic **mail**." *See Teague v. True*, No. 18-cv-00253-JPG, 2018 WL 4335668, at *2 (S.D. Ill. Sept. 11, 2018) (emphasis added).

Ultimately, "censorship of prisoner mail is justified if the following criteria are met":

> First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad. This does not mean, of course, that prison administrators may be required to show with certainty that adverse consequences would flow from the failure to censor a particular letter. Some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty. But any regulation or practice that restricts inmate correspondence must be generally necessary to protect one or more of the legitimate governmental interests identified above.

*Id.* at 413–14; *see Thornburgh*, 490 U.S. at 413–14.

White argues that suppression of his White Nationalist Counter-Intelligence Manual amounts to a First-Amendment violation. In his view, there is no valid penological interest in censoring his correspondence because his Manual "is intended for a general public audience that does not particularly communicate with prisoners, and, its techniques do not explain a method of evading prison communications monitoring, as a key, and, keyword, would somehow have to be passed by the general public using a technique not in the book to even potentially use the techniques to communicate with a prisoner." (White's Reply at 12). The Court disagrees.

Code 296A furthers the substantial government interest in maintaining security and order. White's assertion that "True articulates no legitimate penological interest," (White's Replay at 13), is incorrect. Rather, True asserts that Code 296A worked to advance "prison security and safety . . .

as well as the ability of staff to control correspondence with persons in the community and monitor whether inmates are participating in illegal activities which threaten the safety and security of the institution." (True's Resp. at 17). Indeed, prison officials are not "required to show with certainty that adverse consequences would flow from the failure to censor a particular letter." *Procunier v. Martinez*, 416 U.S. 396, 414 (1974). Still, the DHO pointed to at least *some evidence* that White's White Nationalist Counter-Intelligence Manual could be used to undermine prison monitoring procedures, especially given White's relative notoriety among neo-Nazis, anti-Semites, and other bigots. Moreover, Code 296A is no broader than generally necessary to achieve its underlying penological goals; it hardly limits most outside communications, only those that undermine the prison's ability to prevent subversion. In sum, there was no First-Amendment violation.

No certificate of appealability is required. *See Walker v. O'Brien*, 216 F.3d 626, 638 (7th Cir. 2000).

## III. CONCLUSION

The Court **DENIES** Petitioner William A. White's Petition for Writ of Habeas Corpus.

**IT IS SO ORDERED.**

**Dated: Monday, April 12, 2021**

S/J. Phil Gilbert
**J. PHIL GILBERT**
**UNITED STATES DISTRICT JUDGE**
